# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| SHAYAN MESBAHI, MOHAMMAD MESBAHI, MOSHEN TOOLAMI, MTM AUTOMOTIVE CORP., dba AUTO TECH COLLISION CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> GEICO INSURANCE; ERIK STENTZ, DOES 1-20; <br><br> Defendants. | Case Number CV 07-05772 JF (HRL) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Docket No. 31 |

Defendants GEICO Casualty Company, GEICO Indemnity Company and GEICO General Insurance Company (collectively "GEICO") and Erik Stentz ("Stentz") move for summary judgment against Plaintiffs Shayan Mesbahi, Mohammad "Jack" Mesbahi, Moshen "Mike" Toolami, and MTM Automotive Corporation, doing business as Auto Tech Collision Center. For the reasons discussed below, the motion will be granted in part and denied in part.

## I. Background

Plaintiffs filed the instant case in the Santa Clara Superior Court on October 2, 2007, alleging interference with prospective business advantage and interference with contractual relations by Stentz, breach of the covenant of good faith and fair dealing and promissory estoppel by GEICO, and race and national origin discrimination under 42 U.S.C. §1981, race and national

origin discrimination under the Unruh Civil Rights Act, Civil Code § 51, and intentional infliction of emotional distress by all Defendants. Defendants removed the action to this court on November 14, 2007.

The relevant facts are as follows. GEICO, an automobile insurer, invites certain auto body shops to partner with it and become GEICO "Guaranteed Repair Shops" ("GRS"). Beacom Declaration ("Beacom Dec.") ¶ 2. In 2000, Auto Tech, an auto body shop located in San Jose, California, became a GRS shop. *Id.* at ¶ 3. GEICO guarantees the work done by GRS shops and, if asked by a customer for a recommendation of an auto body shop, will advise the customer of the GRS shops in that geographic area. *Id.* ¶ 4. GEICO's expectations for GRS shops are in writing. *Id.* at Ex. A ¶ 3.

In 2004, GEICO developed its "Auto Repair Xpress" program ("ARX Program"). The ARX Program provides customers with a one-stop option in which an adjuster and repair service are in one location. Beacom Dec. ¶ 4. Each ARX shop is staffed by a GEICO adjuster ready to write an estimate and put the customer into a rental car if needed, as well as to oversee the entire repair process, provide the customer with updates on the progress of the repair, and perform quality assurance inspections of the repair once it is completed. *Id.* GEICO guarantees the work done by ARX shops for as long as the customer owns the vehicle. *Id.*

GEICO represents that it continually evaluates ARX shops and in particular monitors their "cycle time." The cycle time is the number of days it takes a shop to complete repairs for a customer. Beacom Dec. ¶ 7. GEICO asserts that one of the benefits it markets to its customers is that ARX shops will repair their cars quickly, and that in turn GEICO encourages its ARX shops to maintain a cycle time of four days or less so that a customer's repair is completed in less than one business week. *Id.*

Sometime in 2004, GEICO invited Auto Tech to participate in the ARX Program. *Id.* ¶ 8. The process of becoming an ARX shop begins with a recommendation from the field supervisors and adjusters based on their prior experience with a shop's repair history with GEICO. Deposition of John Hicks ("Hicks Dep.") 21:11-25:4. The recommendation that Auto Tech be

2

designated as an ARX shop was made to John Hicks, who until January 2007, was the Auto Damage Manager for Region Four. Hicks managed the supervisors and adjusters at Auto Tech and reviewed performance indicators including cycle times. Hicks Dep. 8:17-20, 9:22-10:6, 21:11-25:4. Hicks then forwarded this recommendation to Dan Beacom, his supervisor, who subsequently approved the recommendation. Hicks Dep. 24:24-25:12. Plaintiffs allege that GEICO employees, including Hicks and Beacom, visited Auto Tech and informed them that Auto Tech was being invited to join the ARX Program because it was trusted, had performed well, and was large enough to handle the requirements of the new program. Declaration of Jack Mesbahi ("J. Mesbahi Dec.") ¶ 4. It is undisputed that there is no written document setting forth terms or conditions of Auto Tech's ARX Program status. Deposition of Shayan Mesbahi at 115:4-18; 123:8-24 ("S. Mesbahi Dep.").

Auto Tech was the first, and, at that time, the only ARX shop in the San Jose/Santa Clara area. Beacom Dec. ¶8. A GEICO adjuster was stationed at Auto Tech, and customers in the San Jose area who called GEICO's claims hotline were informed that Auto Tech now was an ARX shop. *Id.* While participation in the ARX Program would have the effect of GEICO sending an increased number of customers to Auto Tech, Plaintiffs admit that they did not provide any type of payment to Defendants, raise their prices for customer repairs, or provide anything in return to GEICO. S. Mesbahi Dep. at 115:15-116:2. Plaintiffs do assert that GEICO informed them that 100 to 150 repairs per month would be referred under the ARX Program and that Auto Tech would need to hire more employees and be sufficiently equipped to keep up with the expected volume. J. Mesbahi Dep. 74:17-75:9, 78:10-20. Defendants deny that they made any such statements. Beacom Dec. ¶6; S. Mesbahi Dep. 120:9-23. Plaintiffs also allege that initially, after a few months as an ARX Program, Auto Tech was assigned a second adjuster because of the volume of business referred by GEICO, and that after the second adjuster was added Auto Tech's monthly sales attributable to GEICO repairs rose more than tenfold.

Mark Kehoe was the first ARX Program adjuster assigned to Auto Tech. Kehoe worked at Auto Tech from early 2005 until the spring or summer of 2007 and maintained an office on

3

site. Deposition of Mark Kehoe ("Kehoe Dep.") 46:22-47:3; 88:1-17. One responsibility of an adjuster at an ARX shop is to record cycle times on a laptop computer that is linked to the corporate server so that GEICO can analyze the performance of each ARX Program location. Kehoe Dep. 15:21-16:15. Defendants claim that GEICO evaluated Auto Tech's cycle time continuously and requested repeatedly that Auto Tech meet the target time of four days. Beacom Dec. ¶ 9; Hicks Dep. 36:25-37:12; Declaration of Robert J. Gibson ("Gibson Dec.") Ex. C. Defendants also claim that Auto Tech's cycle time typically was five to six days or more. Beacom Dec. ¶ 9; Gibson Dec., Ex. B-C; Deposition of Mike Toolami ("Toolami Dep.") 27:9-23.

In 2006, GEICO began working with Car West, a new auto body shop in the San Jose/Santa Clara area, and later that year GEICO invited Car West to participate in the ARX Program. Beacom Dec. ¶ 10. GEICO claims that Car West exceeded all of the benchmarks by which GEICO evaluates its ARX shops, particularly with respect to cycle time, and that Car West routinely averaged a cycle time of less than the four day target. *Id.* Plaintiffs allege that Car West maintained a low cycle time in comparison to Auto Tech because it was repairing fewer vehicles and that the majority of other ARX shops that repaired a volume of vehicles comparable to Auto Tech's had cycle times of more than five days. Opp. Mot. Ex. 22.

Plaintiffs allege that in January 2007, when Stentz replaced Hicks as the Auto Damage Manager for Region IV, Auto Tech's positive working relationship with GEICO ended. Jack and Shayan Mesbahi had known Stentz since approximately 2000. Plaintiffs claim that during that lengthy period of time, Shayan was told by a friend, Asam, that Stentz had called Asam a "camel jockey." S. Mesbahi Dep. 69:15-70:3. Stentz denies making any such statement. Stentz. Dep. 22:17-25. Shayan Mesbahi also alleges that he was told by a co-worker, Suzanne, that Stentz did not like him because of his Middle-Eastern heritage. S. Mesbahi Dep. 65:18-67:25.

Plaintiffs allege that on March 8, 2007, during a business telephone conversation between Stentz and Shayan Mesbahi, Shayan mentioned Asam, at which point Stentz became agitated and angrily began to shout that Shayan "wanted to talk about people's past." S. Mesbahi Dep. 62:3-

4

63:3.  Plaintiffs claim that Stentz also asked Shayan to provide him with a report by 5:00 P.M. that day as to how Auto Tech would improve its cycle times.  S. Mesbahi Dep. 63:3-10.  Plaintiffs claim that when Shayan called Stentz back later the same day, Shayan suggested that the two be on friendly terms, and that Stentz replied angrily, "I would never have a friend like you.  I don't like you.  I don't like your people."  S. Mesbahi. 65:5-12.  Stentz denies that he made any such statement.  Stentz Dep. 123:15-19.

Plaintiffs allege that following his first conversation with Stentz on March 8 Shayan met with Auto Tech's GEICO adjuster, Kehoe, and informed Kehoe of the conversation.  Plaintiffs claim that Kehoe then volunteered to help Shayan draft an email relating to Auto Tech's cycle times.  S. Mesbahi 80:1-22.  In this email, Shayan referenced a telephone conversation between himself and Beacom.  Opp. Mot. Ex. 4.  That evening, at 8:33 p.m. Stentz wrote an email to Beacom stating, "I was frankly surprised to see Auto Tech on the ARX Program at GEICO.  I have dealt with Shayan and Auto Tech for many years.  I can expand on this point with you in person."  Opp. Mot. Ex. 5.  Beacom responded to Stentz's email that same evening, "Sounds good.  I too have some reservations about this shop.  We recently began working with Car West around the corner for this very reason.  I am looking forward to speaking with you about our alternatives in this area."  Opp. Mot. Ex. 6.

On April 22, 2007, in response to an email from Tina Munoz, a GEICO dispatcher, Stentz wrote that Auto Tech was to be removed from the ARX Program within the next fourteen days and that work should be transferred to Car West.  Opp. Mot. Ex. 9.  On April 23, 2007, there was another email exchange between Munoz and Stentz in which Stentz wrote that the cut-off date for Auto Tech's participation in the ARX Program would be April 30, 2007.  Opp. Mot. Ex. 10.  Plaintiffs claim that on April 24, 2007, Stentz also sent an email terminating Auto Tech's GRS status and that on May 8, 2007, Stentz sent another email reinstating Auto Tech's GRS status.  Opp. Mot. Ex. 11.

GEICO alleges that in May 2007, Beacom made a business decision to remove Auto Tech from the ARX Program and return it to GRS status based on a combination of Auto Tech's

poor cycle time and Car West's ability to outperform Auto Tech on all matrices upon which ARX Programs were evaluated. Beacom Dec. ¶¶ 10-11. Plaintiffs contend that while Beacom technically may have had final authority to terminate Auto Tech's ARX participation, this decision was actually made by Stentz, was motivated by animus toward Plaintiffs because of their Persian descent, and resulted in Auto Tech laying off more than eighteen employees and losing millions of dollars in revenue. Plaintiffs allege that in a telephone conversation between Stentz and Jack Mesbahi, Stentz said that the decision to remove Auto Tech from the ARX Program was his decision as the manager in Northern California. J. Mesbahi Dep. 48:20-49:12. Plaintiffs claim that after this conversation, Jack Mesbahi attempted to contact a number of GEICO employees, including a San Jose manager, Gary Kelton, who told Jack that he was not involved in the decision to remove Auto Tech from the ARX Program and confirmed that it had been Stentz's decision. J. Mesbahi Dep. 54:1-17.

Plaintiffs claim assert that approximately one week later, Jack Mesbahi spoke with Stentz and Stentz told Jack that GEICO would be returning to Auto Tech. Plaintiffs claim that Jack Mesbahi then thanked Stentz and told him that he would recall the employees that had been laid off, and that Stentz assured Jack that all of GEICO's adjusters would be sent back to Auto Tech. J. Mesbahi Dep., 58:21-59:6. Plaintiffs allege that on May 8, 2007, Stentz sent an email to Munoz indicating that something had changed since their last conversation and that Auto Tech would continue as a GRS shop. Opp. Mot. Ex. 16. The next day, Stentz sent another email to Munoz indicating that she again should begin booking appointments at Auto Tech, that she should shift from double-booking to single booking at Car West, and that Kehoe again would be staffed at Auto Tech as an adjuster. Opp. Mot. Ex. 17. Kehoe returned to Auto Tech on May 11, 2007. Opp. Mot. Ex. 19. Plaintiffs claim, however, that very few repairs were referred to Auto Tech over the next month and that Kehoe left after approximately two weeks. S. Mesbahi Dec. ¶ 9. Plaintiffs allege that on June 4, 2007, Stentz sent an email indicating that he planned to speak with Beacom in person regarding Auto Tech. Opp. Mot. Ex. 20. Skelton replied by email to Stentz that he had spoken to Shayan and Jack Mesbahi, that he had informed them that Kehoe

would be removed by June 18, 2007, and that "Bob," a different GEICO adjuster, would be assigned to Auto Tech for two and a half days a week until additional staffing was possible. *Id.*

GEICO claims that Auto Tech remained a GRS shop until July 1, 2009, and that Defendants continued to guarantee Auto Tech's vehicle repairs for GEICO customers. Beacom Dec. ¶ 3. Plaintiffs allege that since early 2009, GEICO has sent virtually no referrals to Auto Tech. Mesbahi Dec. ¶9.

## II. Legal Standard

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Material facts are those that might affect the outcome of the case under the governing law. *Id.* at 248. There is a genuine dispute about a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the party moving for summary judgment would not bear the ultimate burden of persuasion at trial, it must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

The evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Summary judgment thus is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the material issue in its favor. *Anderson,*

7

477 U.S. at 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991). A high standard for granting summary judgment is particularly appropriate in a discrimination case "because the ultimate question is one that can only be resolved through a searching inquiry - one that is most appropriately conducted by a fact-finder, upon a full record." *Schnidrig v. Columbia Mach., Inc.* 80 F.3d 1406, 1410 (9th Cir. 1996), quoting *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1563 (9th Cir. 1994).

### III. Discussion

#### A. Evidentiary objections

Defendants object to certain evidence contained in the deposition transcript of Shayan Mesbahi on the grounds of hearsay and lack of foundation. Hearsay is a statement, other than one made by the declarant, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is inadmissible except as provided by the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. The testimony of a witness who does not have personal knowledge of the subject of his or her testimony is inadmissible. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. Fed. R. Evid. 602. Defendants' objections to evidence are addressed as follows:

**Statements 1:**

Defendants object to two statements made by Shayan Mesbahi concerning his recollection of a conversation with his friend, Asam. In both instances, Shayan claims that Asam told him that Stentz once called Asam a "camel jockey." S. Mesbahi Dep. 69:21-70:3; 72:24-73:1. The alleged statement was made by Stentz and would be considered a non-hearsay party admission if testified to by Asam; however, the proffered testimony is of Shayan Mesbahi as to what Asam said to him regarding Stentz's statement. This is hearsay. Asam's statement was made outside of court, not by the declarant or a party, and is offered in evidence to prove the truth of the matter asserted - that Stentz called Asam a "camel jockey." Such evidence cannot be considered on a motion for summary judgment. SUSTAINED.

**Statements 2:**

Case No. CV 07-05772 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT
(JFLC1)

Defendants object to two statements made by Shayan Mesbahi recalling a conversation with another friend, Suzanne, who was a colleague of Stentz. S. Mesbahi Dep. 67:6-12, 67:20-25. In both instances, Shayan claims that Suzanne told him that Stentz did not like him partially because Shayan was of Middle Eastern descent. *Id.* Suzanne's statement was made outside of court, not by the declarant, and is offered in evidence to prove the truth of the matter asserted - that Stentz does not like Shayan because he is of Middle Eastern descent. SUSTAINED.

**Statements 3:**

Defendants object to two statements made by Shayan Mesbahi recalling a conversation between himself and Stentz. In both instances, Shayan alleges that Stentz said to him directly, "I would never have a friend like you. I don't like you. I don't like your people." S. Mesbahi Dep. 65:5-12. This statement comes within the party admission exception to the hearsay rule. Fed. R. Evid. 801(d)(2)(a). OVERRULED.

**B. Discrimination claims**

42 U.S.C. §1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every state . . . to make and enforce contracts . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). California's Unruh Civil Rights Act, Civil Code Section 51, et seq., makes business entities liable for denying "full and equal accommodations" on the basis of sex, race, color, religion, ancestry, national origin, disability or medical condition. Cal. Civ. Code 51. The right to contract and do business with a business entity, free of racial or national origin discrimination is an "advantage" that is protected by the Unruh Civil Rights Act. *Payne v. Anaheim Memorial Medical Center, Inc.* 130 Cal. App. 4th 729, 745-46 (2005). Plaintiffs may establish a *prima facie* case either by presenting direct evidence of discriminatory intent or by establishing the existence of factors such as those set forth in *McDonnell Douglas*. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144-45 (9th Cir. 2006) (determining as a matter of first impression that the *McDonnell Douglas* standard was the appropriate one to apply in a Section 1981 discrimination case involving a non-employment contract)*; McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004);

*Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir. 1998).

### 1. *Prima facie* case

### A. Direct evidence of discrimination

Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (2003), citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir.1998). Plaintiffs allege that Stentz, during a business telephone conversation with Shayan Mesbahi on March 8, 2007, stated, "I would never have a friend like you. I don't like you. I don't like your people." S. Mesbahi Dep. 65:5-12. Defendants argue that even if Stentz made such a statement, (1) the statement is so vague that a reasonable person would not conclude that it was intended to describe people of Persian descent; and (2) that Plaintiffs have failed to establish a causal connection between the alleged comment and GEICO's decision to remove Auto Tech from the ARX Program. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004) (determining that a stray remark by a non-decision maker is not sufficient to create a material issue of fact); *see also Smith v. Firestone Tire and Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir. 1989) (holding that stray "remarks,. . .when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker in issue").

Defendants' first argument is unpersuasive for several reasons. First, the statement must be viewed in context. It is undisputed that the Mesbahis and Stentz had known each other since approximately 2000, and it would be reasonable for a trier of fact to presume that Stentz knew of the Mesbahis' Middle Eastern heritage. Secondly, Plaintiffs allege that Shayan had two conversations with Stentz on March 8, 2007. During the first conversation, Stentz allegedly became angry and began screaming after Shayan mentioned his friend Asam, another man of Middle Eastern descent. S. Mesbahi Dep. 62:3-63:3; 79:11-21. Then, later that same day, when Shayan suggested that he and Stentz could interact on a friendly or cordial basis, Stentz allegedly said, "I would never have a friend like you. I don't like you. I don't like your people." S.

Mesbahi Dep. 65:5-12.  Finally, Defendants suggest no other explanation as to the import of the words "your people" other than as a description of Shayan's national origin.   "With direct evidence, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Blue v. Widnall*, 162 F.3d 541, 546 (9th Cir.1998), citing *Godwin*, 150 F.3d at 1220-21.  A plaintiff is required to produce "very little" direct evidence of the employer's discriminatory intent to move past summary judgment. *Godwin*, 150 F.3d at 1221, quoting *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir.1991).  Plaintiffs have produced sufficient evidence for a reasonable jury to find that Stentz's statement is direct evidence of racial animus.

Defendants' second argument presents a closer question.  To survive summary judgment, Plaintiffs must offer evidence tending to show that there is a nexus between Stentz's alleged discriminatory remarks and the subsequent termination of Plaintiffs' ARX Program status. *Vasquez*, 349 F.3d at 640 (concluding that a stray remark by a non-decision maker is not sufficient to create a material issue of fact).  Defendants and Plaintiffs present contradictory evidence as to who made the decision to terminate.  Defendants, relying on Beacom's and Stentz's deposition testimony, allege that Beacom, not Stentz, was the decision-maker.  Beacom Dec. at ¶¶ 11-13; Stentz Dep. 75:9-14, 80:22-23.  Plaintiffs, relying on Jack Mesbahi's deposition testimony, claim that two separate conversations support their position that Stentz was the actual decision-maker.  First, Plaintiffs point to Stentz's alleged statement to Jack Mesbahi that, "This is my decision.  This is my – I'm the manager in Northern California." J. Mesbahi Dep. 48:20-49:12.  Second, Plaintiffs cite Skelton's alleged statement, "I'm not involved and it's not my decision.'  And, you know, we work together for years, and this is just between Erik – his decision.  I don't have any involvement with this part." J. Mesbahi Dep. 54:1-17.  Taking these statements together, a reasonable trier of fact could find that the decision to terminate Auto Tech's ARX status ultimately was made by Stentz, even if technical approval of the decision was

Beacom's responsibility.[1]

Plaintiffs' evidence is sufficient to raise a genuine issue of material fact as to whether Stentz was the decision-maker. Moreover, on March 8, 2007, the same day that Stentz allegedly made racially-motivated statements to Shayan Mesbahi, he also sent an email to Beacom, stating that he was "surprised to see Auto Tech on the ARX Program at GEICO," that he had "dealt with Shayan and Auto Tech for many years" and that he could "expand on this point with [him] in person." Opp. Mot. Ex. 5. In response, Beacom wrote an email back stating, "Sounds good. I too have some reservations about this shop. We recently began working with Car West around the corner for this very reason. I am looking forward to speaking with you about our alternatives in the area." Opp. Mot. Ex. 6. The timing of this email exchange in the context of the alleged racially-charged statement by Stentz is further evidence of a nexus between the statements themselves and Stentz's influence or role in the decision-making process.

## B. *Prima facie* case of discrimination under the *McDonnell Douglas* framework

Under *McDonnell Douglas*, if the plaintiff satisfies the initial burden of establishing a *prima facie* case of racial discrimination, the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action; if the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination. *Lindsey*, 447 F.3d at 1144, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The proof required to establish a *prima facie* case is "'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Chuang v. Univ. of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1124 (9th Cir. 2000), quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

The specific elements of a *prima facie* case may be altered to analyze the specific facts before the court. *Lindsey,* 447 F.3d at 1145; *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 854 (9th

---

[1] During oral argument, Plaintiffs' counsel admitted that Beacom technically was the final decision-maker, but also reaffirmed Plaintiffs' position that Stentz was the *actual* decision-maker and the "but, for" cause of the termination.

Cir. 2002). In order to establish a prima facie case of discrimination under *McDonnell Douglas* in the instant action, Plaintiffs must show that: (1) they belong to a class of persons protected by statute; (2) Auto Tech was performing competently as an ARX Program auto shop; (3) they suffered an adverse action; and 4) some other circumstances suggest a discriminatory motive.

Defendants' most substantial challenge to Plaintiffs' *prima facie* case involves the adequacy of Auto Tech's performance. Defendants offer both testimonial and documentary evidence that Auto Tech's cycle time was substandard and needed to be improved. Gibson Dec. Exs. A-C. Plaintiffs nonetheless contend that they were performing competently. Opp. Mot. Ex. 22. Although they admit that they did not consistently achieve a cycle time of four days or less, Plaintiffs do proffer evidence that they handled a significantly greater volume of repairs than Car West, and that their cycle time was comparable to that of other ARX shops with a similar volume of repair work. Opp. Mot. Ex. 22. Plaintiffs also offer undisputed evidence that other ARX auto shops were not eliminated from the program despite the fact that they had longer cycle times than Auto Tech. Hicks Dep. 44:18-45:15. Under the circumstances, a reasonable trier of fact could find that Auto Tech was performing competently, even if its cycle time did not meet GEICO's desired standard.

### 2. Defendants' legitimate non-discriminatory reason for the adverse action

Defendants contend that their decision to terminate Auto Tech was motivated by a legitimate comparison of Auto Tech's performance with that of Car West. Beacom Dec. ¶¶ 10-11, 13. As noted above, Defendants offer evidence of frequent emails between GEICO and Plaintiffs expressing concern over Auto Tech's cycle time. Gibson Dec. Ex. B-C; Toolami Dep. 27:9-23.

### 3. Whether the legitimate non-discriminatory reason for the adverse action was pretextual

Once a defendant presents legitimate non-discriminatory reasons for its actions, the presumption of discrimination "drops out of the picture," and the plaintiff has the new burden of proving that the proffered reasons were a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). "[P]laintiff[s] can prove pretext in two ways: (1) indirectly,

13

by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang*, 225 F.3d at 1127, citing *Godwin*, 150 F.3d at 1220-22. While the inference created by the *prima facie* case no longer stands, the evidence utilized to substantiate it may be considered for examining pretext. *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 143, citing *St. Mary's Honor Center*, 509 U.S. at 507-508. The court must analyze the entire record in order to evaluate the credibility of the reasons proffered, the possibility of other non-discriminatory reasons, and the ultimate possibility that discrimination on the basis of national origin or race was the main motive for the adverse action.

As noted above, Plaintiffs offer evidence that Auto Tech was not the only ARX shop that failed to achieve GEICO's ideal cycle time. Opp. Mot. Ex. 22. As Plaintiffs contend in their opposition papers, the vast majority of auto body repair shops participating in GEICO's ARX Program failed to achieve the benchmark. Between January 1, 2007 and March 24, 2007, at or about the time that Stentz became regional manager and GEICO began to discuss terminating Auto Tech's ARX status, seven other ARX shops had cycle times even longer than Auto Tech's, including three shops with cycle times of more than six days. *Id.* While Car West was the only other ARX shop in direct competition with Auto Tech, the comparison of their performance arguably was flawed. While Car West maintained a much better cycle time, it also handled a significantly lower volume of repairs. Although Car West had a 1.6 day driveable cycle time, it repaired only forty-one vehicles, while Auto Tech repaired 232 vehicles. Opp. Mot. Ex. 22. In light of the undisputed fact that GEICO did not terminate any other auto body shop's ARX status irrespective of whether it met the cycle time standard, this evidence is sufficiently substantial to raise a genuine issue of material fact as to whether Defendants' proffered reason for Auto Tech's termination was pretextual.

### C. Interference with prospective business advantage

The elements of tortious interference with prospective business advantage are as follows:

14

(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship, which acts are wrongful by some legal measure other than the fact of interference itself.  An act is independently wrongful if it is "unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp*., 63 P.3d 937, 950-51 (2003); (4) actual disruption of the relationship, and (5) economic harm to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co.,* 63 P.3d at 950.

Stentz argues that he is entitled to summary judgment on Plaintiffs' claim for interference with prospective business advantage for the following reasons: (1) the only evidence of alleged interference consists of two alleged statements, the first being hearsay and thus inadmissible, and the other being the ambiguous, "I don't like you.  I don't like your people;" (2) Stentz did not make the decision to remove Auto Tech from ARX status, Beacom Dec.¶ 12; and (3) there is no evidence that Stentz made the alleged racially offensive statements to GEICO.  MSJ 13-14. Stentz's first two arguments are addressed above.  The question of whether Stentz made the offensive remarks to GEICO is immaterial based upon the Court's earlier conclusion that a reasonable fact-finder could determine that Stentz himself was the decision-maker.

**D**. **Interference with contractual relations**

The elements of a claim for intentional interference with contractual relations are:  (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

It is undisputed that there was no written contract governing Auto Tech's participation in

the ARX Program.[2]  S. Mesbahi Dep. 123:8-20; J. Mesbahi Dep. 83:2-4.  Plaintiffs claim that there was an oral or implied-in-fact contract; Defendants contend that no contract of any kind existed with respect to Auto Tech's ARX status.  Beacom Dec. ¶ 5.

In order for an oral contract or promise to be enforceable, it "must be definite enough that a court can determine the scope of the duty, and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Ladas v. CSAA,* 19 Cal.App. 4th 761, 770 (1993) (holding that "Under basic contract law '[a]n offer must be sufficiently definite, or must call for such definite terms in the acceptance that the performance promised is reasonably certain.'"); *see also Robinson & Wilson, Inc. v. Stone,* 35 Cal.App.3d 396, 407 (1973).  An alleged oral contract is not binding if its terms are vague and uncertain.  *Banco Do Brasil, S. A. v. Latian, Inc.,* 234 Cal.App.3d 973, 1015, n. 55 (1991).

Here, the evidence fails to establish the existence of a promise in certain terms.  Indeed, Plaintiffs are unable to identify any terms relating to the duration or termination of any alleged contract.  J. Mesbahi Dep. 83:18-84:2; M. Toolami Dep. 26:12-14.  In response to a question as to whether anyone from GEICO told him how long Auto Tech would remain on the program, Shayan Mesbahi answered, "No. But my understanding was as long as we were in a good standing with them, it should continue." S. Mesbahi Dep. 115:8-11.  When asked whether GEICO ever actually promised that Auto Tech would remain on the ARX Program as long as it was in good standing, Shayan Mesbahi replied, "No. That was my understanding" and "I don't

---

[2]  Plaintiffs contend in their opposition papers that even if there was no contract governing Auto Tech's status as an ARX shop, contractual claims against Stentz and GEICO also arise from an alleged contract governing Auto Tech's participation in the GRS Program.  Opp. Mot. Exs. 1-3.  However, there is no evidence Auto Tech ever was eliminated from the GRS Program.  Plaintiffs allege that Auto Tech's GRS status recently has been "unofficially" terminated, as reflected in a decrease in the number of referrals but it is undisputed that GEICO has continued to employ adjusters at Auto Tech and guarantee Auto Tech's work as a part of the GRS Program.  *See* S. Mesbahi Dec. ¶ 9 (stating that GEICO has continued to send its adjusters to Auto Tech); Beacom Dec. ¶ 11; *contra* J. Mesbahi Dep. 47:11-48:6) (claiming that Auto Tech's GRS status has been "unofficially" terminated).  There is no language in any written document in the record that makes any reference to or guarantees the volume of work that Auto Tech should expect or is entitled to receive.  Opp. Mot. Ex. 1-3; Beacom Dec. ¶ 6.

16

remember talking about that." S. Mesbahi Dep. 125:7-17; 115:4-11. Plaintiffs concede that no actual representations were made as to the terms or duration of Auto Tech's participation in the ARX Program.

Even if Plaintiffs could show that there was an oral promise by GEICO to maintain Auto Tech's ARX status as long as it was in "good standing," such a contract would be unenforceable under the Statute of Frauds because it would be indefinite in its duration and thus could not be performed within a year from its making. *See* Cal. Civ. Code §1624(a)(1).

Nor is there any evidence of an implied-in-fact contract. "An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621. "The essential elements of an implied-in-fact contract are mutual assent and consideration." *See Bleu Products, Inc. v. Bureau Veritas Consumer Product Services, Inc., et al.* No. CV 08-2591CAS, 2009 WL 2412413, at *9 (C.D. Cal. Aug. 3, 2009), citing *Chandler v. Roach*, 156 Cal.App.2d 435, 440 (1957). The parties do not dispute that their business relationship involved mutual assent, but there is no evidence that Plaintiffs provided any consideration in exchange for their participation in the ARX Program. As argued by Defendants, Plaintiff's view would allow Auto Tech to obtain all of the benefits of being an ARX Program participant without providing any consideration or undertaking any increased burdens beyond those associated with participation in the GRS Program. While GEICO sent more customers to Auto Tech, Auto Tech did not provide any type of payment to Defendants, raise its prices for customer repairs, or provide anything in return to GEICO. S. Mesbahi Dep. 115:15-116:2. Plaintiffs do not identify any other form of consideration.

**E. Breach of implied covenant of good faith and fair dealing**

Plaintiffs allege that GEICO breached the implied covenant of good faith and fair dealing under California common law. This claim is wholly dependent upon the existence of a contract. *Racine & Laramie, Ltd. v. Cal. Dep't of Parks & Recreation*, 14 Cal. Rptr. 2d 335, 338-39 (Ct. App. 1993); see also *Foley v. Interactive Data Corp.*, 765 P.2d 373, 389 (Cal. 1988) (explaining that "[t]he covenant of good faith and fair dealing was developed in the contract arena and is

17

aimed at making effective the agreement's promises").  Because no contract existed governing the terms of Auto Tech's participation in the ARX Program, *see supra* III.D., this claim cannot survive summary judgment.

### F. Intentional infliction of emotional distress

To establish a claim for intentional infliction of emotional distress, a Plaintiff must show: (1) extreme and outrageous conduct by the defendant; (2) intention to cause emotional distress, or reckless disregard; (3) severe emotional suffering; and (4) actual and proximate causation of the emotional distress.  *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 155, n. 7 (1987); *Helgeson v. American Int'l*, 44 F. Supp. 2d 1091, 1094 (S.D. Cal. 1999), citing *KOVR-TV, Inc. v. Superior Court*, 31 Cal.App.4th 1023, 1028 (1995).  "Severe emotional distress is not mild or brief; it must be so substantial or long lasting that no reasonable person in a civilized society should be expected to bear it."  *James v. Career System Development Corp.*, No. C 05-4125, 2008 WL 3891968 at *5 (Cal. N.D. August 20, 2008), citing *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal.App.3d 376, 367 (1970).  Plaintiffs argue that since they have demonstrated the existence of a triable issue of material fact as to their discrimination claim under Section 1981 and the Unruh Civil Rights Act, there is sufficient evidence to support their claim for intentional infliction of emotional distress, as racial discrimination per se is beyond the bounds of decency.  However, Plaintiffs offer no evidence as to the second element of their claim, which is that they in fact have suffered severe or extreme emotional distress.  *Id.*  Without such evidence, this claim cannot survive summary judgment.

### F.  Promissory Estoppel

Promissory estoppel is based on the theory that "a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement."  *Smith v. City of San Francisco*, 225 Cal.App.3d 38, 48 (1990), citing *Youngman v. Nevada Irrigation Dist*. 70 Cal.2d 240, 249 (1969); *Signal Hill Aviation Co. v. Stroppe*, 96 Cal. App.3d 627, 637 (1979).  In order for Plaintiffs to maintain their claim for promissory estoppel, they must present evidence that

Defendants: (1) made a promise that was clear and unambiguous in its terms; (2) that Plaintiffs relied on the promise; (3) that Plaintiffs' reliance was both reasonable and foreseeable; and (4) that Plaintiffs were injured by their reliance. *Laks v. Coast Fed. Sav. & Loan Assn.*, 60 Cal.App.3d 885, 890 (1976). Plaintiffs allege two separate instances of reliance upon promises allegedly made by GEICO.

### 1. GEICO's invitation to Auto Tech to join the ARX Program

Plaintiffs claim that when they were invited to participate in the ARX Program in 2004, they added employees and machinery to handle the increased volume of repairs that they necessarily expected would accompany Auto Tech's designation as an ARX shop. J. Mesbahi Dec. at ¶4; J. Mesbahi Dep. 74:22-75:9; 78:10-79:25. Plaintiffs admit, however, that GEICO never required or suggested that Auto Tech needed to hire additional employees, maintain a certain number of employees or have a certain amount of space in its facility to be an ARX shop. Plaintiffs' evidence consists entirely of the Mesbahis' subjective "understanding." S. Mesbahi Dep. at 115:4-18; 120:9-23; 123:8-24. Plaintiffs have not identified evidence that would permit a reasonable trier of fact to determine that they relied on "a promise that [was] clear and unambiguous in its terms." *Laks*, 60 Cal.App.3d at 890.

### 2. GEICO's alleged assurances that Auto Tech would retain two adjusters regardless of whether other shops in the area joined the ARX Program

Plaintiffs allege in their complaint that in November 2006, Hicks, who was Stentz's predecessor, represented to Shayan Mesbahi that two adjusters would remain at Auto Tech even if additional ARX shops were added in the Bay Area. Plaintiffs claim that they relied on this representation by Hicks and proceeded to purchase the building in which Auto Tech then was located and make certain improvements thereto. Complaint ¶¶ 10, 55; S. Mesbahi 118:8-120:22. Plaintiffs' only evidence on this point is Shayan Mesbahi's testimony, and Shayan is unable to recall whether it was Hicks or Hicks's superior, Beacom, who made the alleged statement. *Id.* Plaintiffs also have admitted in interrogatory responses that they closed escrow on the building on or about October 4, 2006, a month before Hicks' representations allegedly were made. Gibson Dec., Ex. K. In light of this admission, Plaintiffs cannot show that they relied upon the

19

alleged representation in purchasing the building. In fact, Plaintiffs acknowledge that the alleged statement "confirmed...their decision to purchase the building based upon the increased revenue from the Guaranteed Repair program and the Xpress program was a sound decision." *Id.*

### IV. ORDER

Good cause therefor appearing, Defendants' motion for summary judgment is DENIED as to Plaintiffs' claims pursuant to 42 U.S.C. § 1981 and Cal. Civ. Code § 51 and for intentional interference with prospective business advantage by Stentz, and GRANTED as to Plaintiffs' remaining claims for relief.

**IT IS SO ORDERED.**

DATED: 10/5/09

_____
JEREMY FOGEL
United States District Judge__

This Order was served on the following persons:

Daniel Stewart Rodman drodman@swlaw.com

Robert David Baker attyatlaw@earthlink.net

Robert J. Gibson hgibson@swlaw.com, cfrench@swlaw.com

Sheila K Carmody scarmody@swlaw.com, mmendez@swlaw.com

21